# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Terrance L. Taylor, being duly sworn, do hereby depose and state as follows:

## I. INTRODUCTION

1. I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"). I have been a Special Agent with HSI since March 2012. I retired from HSI in December 2024 and was rehired by HSI in September 2025. I am currently assigned to the Office of the Resident Agent in Charge, HSI Charleston, West Virginia. During my career, I gained experience in conducting investigations involving computers and the procedures that are necessary to retrieve, collect, and preserve electronic evidence. Through my training and experience—including on-the-job discussions with other law enforcement agents and cooperating suspects—I am familiar with the operational techniques and organizational structure of child pornography distribution networks as well as the traits and characteristics of child pornography collectors and possessors and their use of computers or other electronic and media devices to facilitate the collection, possession, trading, distribution, access and receipt of child pornographic materials.

2. I am a Special Agent with twenty-four years of federal law enforcement experience.. Prior to my employment with HSI, I was a Police Officer for two years in Huntington, West Virginia, a Special Agent with the United States Department of State-Bureau of Diplomatic Security for six years, a Special Agent with the Naval Criminal Investigative Service for two years, and a Special Agent with the United States Department of State-Office of Inspector General for two years. I am a graduate of three federal law enforcement academies at the Federal Law Enforcement Training Center ("FLETC") and a graduate of the West Virginia State Police Academy. I graduated from the Criminal Investigator Training Program in 2002, and

the Immigration and Customs Enforcement Special Agent Training Program in 2012. As part of these programs, I received extensive training in the areas of law within the jurisdiction of HSI. These areas include laws and regulations pertaining to the importation of various types of merchandise and contraband, prohibited items, money laundering, and various immigration violations. I have more specifically received training in the areas of child pornography and the sexual exploitation and abuse of children. This training includes specialized instruction on how to conduct criminal investigations related to violations of child protection laws pursuant to Title 18, United States Code, Sections 2251, 2252, 2252A, 2256, and 2422.

## II. PURPOSE OF THE AFFIDAVIT

3. This Affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the locations specifically described in Attachment A of this Affidavit, including those properties and/or persons listed below for contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) and (a)(5)(B) (distribution and possession of child pornography) and 18 U.S.C. § 2422(b) (enticement of a minor) (collectively, the "Subject Offenses"), which items are more specifically described in Attachment B of this Affidavit:

a. The entire property located at 6904A Big Seven Mile Road, Cabell County, Lesage, West Virginia 25537 (the "SUBJECT PREMISES"), including annexes, garages, carports, the outside yard, curtilage, mailboxes, trash containers, debris boxes, sheds and outbuildings located therein;

b. The person of Roger Dale FERGUSON, Jr. ("FERGUSON"), as further identified in Attachment A, if present at the SUBJECT PREMISES during the execution of the search warrant;

c. The content of computers and electronic storage devices located and seized therein;

d. The content of any locked cabinets, containers, drawers, boxes or other receptacles large enough for paper record retention or electronic storage devices located therein; and

e. Any vehicles located at the SUBJECT PREMISES that are under the dominion and control of any resident of the SUBJECT PREMISES.

4. Based on my training and experience and in related investigations and search warrants, and the experience of other law enforcement investigators I have communicated with, I am aware that it is common for items of digital media, including, but not limited to laptop computers, cell phones, flash drives, cameras, and digital music devices, to be transported or stored in motor vehicles. Therefore, I request the search warrant authorize the search vehicles on the subject premises that fall under the dominion or control of any resident of the SUBJECT PREMISES.

5. This Affidavit is also submitted in support of an application for a search warrant for the person(s) described in Attachment A. As set forth herein, there is probable cause to search the person of Roger Dale FERGUSON, Jr, as further described in Attachment A, if present at the time of the execution of the search warrant for the items described in Attachment B, including cell phones and digital storage devices, such as thumb drives, that can be concealed on a person. I believe probable cause exists for the issuance of a warrant to search FERGUSON for (1) property that constitutes evidence of a federal criminal offense; (2) contraband, the fruits of a federal crime, or things otherwise criminally possessed; and/or (3) property designated or intended for use or which is or has been used as the means for committing a federal criminal

offense, namely violations of the Subject Offenses.

6. This affidavit is being submitted for the limited purpose of securing a search warrant and, accordingly, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts necessary to establish probable cause that violations of the Subject Offenses have occurred in Cabell County, West Virginia, within the Southern District of West Virginia, and that evidence of those violations, contraband, and fruits of those violations is presently at the SUBJECT PREMISES, as more particularly described in Attachment A.

## III. STATUTORY AUTHORITY

7. The investigation concerns potential violations of 18 U.S.C. §§ 2252A(a) (2) and (5)(B) and 2422(b), relating to matters involving the sexual exploitation of minors.

a. **18 U.S.C. § 2252A(a)(2)** prohibits any person from knowingly receiving or distributing any child pornography that has been mailed or shipped or transported in interstate or foreign commerce by any means, including by computer.

b. **18 U.S.C § 2252A(a)(5)(B)** prohibits any person from knowingly possessing any book, magazines, periodicals films, video tapes computer disk or other matter that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means including computer, or that was produced using materials mailed, or shipped or transported in interstate or foreign commerce by any means including computer.

c. **18 U.S.C. § 2422(b)** prohibits any person from using any facility or means of interstate commerce to knowingly persuade, induce, entice, or coerce a minor to engage in any sexual activity for which any person can be charged with a criminal offense, including the criminal offense of production of child pornography in violation of 18 U.S.C. § 2251(a).

## IV. DEFINITIONS

8. The following definitions apply to this Affidavit and its Attachments.

a. The term "**minor**," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

b. The term "**sexually explicit conduct**," as used in 18 U.S.C. § 2256(2)(A)(i-v), is defined as actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic areas of any person.

c. The term "**illicit sexual conduct**" means (1) a sexual act (as defined in section 2246) with a person under 18 years of age that would be a violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States; or (2) any commercial sex act (as defined in section 1591) with a person under the age of 18 years of age.

d. The term "**visual depiction**," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disk or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

e. The term "**computer**," as defined in 18 U.S.C. § 1030(e)(1), means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

f. The term "**child pornography**," as defined in 18 U.S.C. § 2256(8), means any visual depiction, including any photograph, film, video, picture, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means of sexually explicit conduct, where

  i. the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

  ii. such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or

iii. such visual depiction has been created, adapted or modified to appear that an identifiable minor is engaging in sexually explicit conduct.

g. The terms "**records**," "**documents**," and "**materials**," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact disks, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

h. "**Internet Service Providers**" (ISPs), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-locations of computers and other communications equipment.

i. "**Internet Protocol address**" (IP address), as used herein, is a code made up of numbers separated by dots that identifies a particular computer on the Internet. Every computer requires an IP address to connect to the Internet. IP addresses can by dynamic, meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be static if an ISP assigns a user's computer a particular IP address each time the computer accesses the Internet.

j. "**Domain names**" are common, easy to remember names associated with an IP address. For example, a domain name of www.usdoj.gov refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period.

k. "**Website**" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as

Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

## V. BACKGROUND REGARDING COMPUTERS, CHILD PORNOGRAPHY AND THE INTERNET

9. I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience and knowledge, I know the following:

a. Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. It has also revolutionized the way in which child pornography collectors interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies). Darkroom facilities and a significant amount of skill were required in order to develop and reproduce the photographic images. As a result, there were definable costs involved with the production of pornographic images. To distribute these images on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their detection by the public. The distribution of these wares was accomplished through a combination of personal contact, mailings, and telephone calls. Any reimbursement would follow these same paths.

b. The development of computers has added to the methods used by child pornography collectors to interact with and sexually exploit children. Computers serve four functions in connection with child pornography. These are production, communication, distribution, and storage.

c. Child pornographers can now transfer photographs from a camera in a computer-readable format. With the advent of digital cameras, the images can now be transferred directly onto a computer. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornography can be transferred via electronic mail or through file transfer

protocols (FTP) to anyone with access to a computer and modem.[1] Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), and easy access to the Internet, the computer is a preferred method of distribution and receipt of child pornographic materials among pornographers.

d. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has increased tremendously within the last several years. These drives can store hundreds of thousands of images at very high resolution.

e. The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f. Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo!, Inc. and Google, Inc., among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can often be found on the user's computer.

g. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner

[1] The File Transfer Protocol ("FTP") is a protocol that defines how files are transferred from one computer to another. One example, known as "anonymous FTP," allows users who do not have a login name or password to access certain files from another computer, and copy those files to their own computer.

often can recover evidence suggesting whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded. Such information is often maintained on the computer indefinitely until overwritten by other data.

## VI. SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER AND ELECTRONIC DEVICE SYSTEMS

10 Based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers and other electronic devices, I know that data can be stored on a variety of computer systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage.

11. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded. Such information is often maintained on the computer indefinitely until overwritten by other data.

12. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a) Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched;

b) Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c) The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d) Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

13. Based on my own experience and my consultation with other agents who have

been involved in computer searches, searching computerized information for contraband, evidence, fruits, or instrumentalities of a crime often requires the seizure of all of a computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords), so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. There are several reasons that compel this conclusion:

a) The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices; and

b) In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit ("CPU"). Further, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software that may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

14. As described further in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B), of any device located within the SUBJECT PREMISES or any person or vehicles identified in Attachment A.

15. I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records referenced above will be stored on that computer or storage medium, for at least the following reasons:

a) Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b) Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c) Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

d) Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

e) Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

16. As further described in Attachment B, this application seeks permission to locate

not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a) Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b) Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (*e.g.*, registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c) The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.

d) Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.

e) Some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (*e.g.*, a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user.

f) Moreover, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (*e.g.*, internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g) A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h) The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i) Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

j) I know that when an individual uses a computer to distribute or attempt to distribute child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of a crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used;

data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

17. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a) The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b) Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c) Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

18. Additionally, based upon my training and experience and information related to me

by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of wireless routers, which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be secured (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or unsecured (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

19. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and its attachments, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## VII. <u>BIOMETRIC ACCESS TO DEVICES</u>

20. This warrant permits law enforcement to compel FERGUSON, if located at the

SUBJECT PREMISES, to unlock any devices requiring biometric access subject to seizure pursuant to this warrant. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

21. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

22. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

23. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

24. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

25. As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

26. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can

occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

27. Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of FERGUSON to the fingerprint scanner of the devices found at the SUBJECT PREMISES; (2) hold the devices found at the SUBJECT PREMISES in front of the face of FERGUSON and activate the facial recognition feature; and/or (3) hold the devices found at the SUBJECT PREMISES in front of the face of FERGUSON and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to compel that individuals located at the SUBJECT PREMISES state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to compel individuals located at the SUBJECT PREMISES to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## VIII. CHARACTERISTICS OF PERSONS WHO COLLECT OR TRAFFIC CHILD PORNOGRAPHY

28. Your affiant has experience in assisting with, and leading, investigations into child pornography. Your affiant has conducted investigations into those who solicit and share child pornography by electronic means. Your affiant has worked with other law enforcement agencies to conduct logical investigations into those who solicit, share and otherwise engage in activity related to child pornography.

29. As a result of the aforementioned knowledge and experience, your affiant has learned that the characteristics described in this affidavit are generally found to exist in varying combinations and be true in cases involving offenders who send, cause to be sent, distribute, exhibit, possess, display, transport, manufacture or produce material which depicts minors engaged in sexually explicit conduct. Said material may include, but is not limited to, photographs, negatives, slides, magazines, printed media, motion pictures, video tapes, books and other media stored electronically on computers, digital devices or related digital storage media.

30. Offenders who deal with the above-referenced child pornography material depicting minors engaged in sexually explicit conduct obtain or traffic in such materials through many sources and by several methods and means. These sources, methods and means include, but are not limited to, the following:

a. Downloading via the Internet and other computer networks (including from websites, peer-to-peer file sharing networks, news groups, electronic bulletin boards, chat rooms, instant message conversations, internet relay chats, email).

b. Receipt from commercial sources within and outside of the United States through shipments, deliveries and electronic transfer.

c. Trading with other persons with similar interests through electronic transfer, shipments or deliveries.

31. These offenders collect materials depicting minors engaged in sexually explicit conduct for many reasons. These reasons include the following:

a. For sexual arousal and sexual gratification.

b. To facilitate sexual fantasies in the same manner that other persons utilize adult pornography.

c. As a medium of exchange in return for new images and video depicting minors engaged in sexually explicit conduct.

32. These offenders often view their child pornographic materials as valuable commodities, sometimes even regarding them as prized collections. Subsequently, these offenders prefer not to be without their child pornographic material for any prolonged period of time and often go to great lengths to conceal and protect their illicit collections from discovery, theft or damage. To safeguard their illicit materials, these offenders may employ the following methods:

a. The use of Internet-based data storage services, such a Google Drive.

b. The use of labels containing false, misleading or no title.

c. The application of technologies, software and other electronic means such as encryption, steganography (the practice of concealing a file, message, image, or video within another file, message, image, or video), partitioned hard drives, and misleading or purposefully-disguised applications on electronic devices.

d. The use of safes, safety deposit boxes or other locked or concealed compartments within premises or structures that the offender controls.

## IX. <u>FACTS ESTABLISHING PROBABLE CAUSE</u>

33. On March 3, 2026, a Homeland Security Investigations (HSI) Greenville Special Agent (SA), acting in an undercover capacity, hereinafter referred to as UCA, was monitoring a live surface website chatroom, herein referred to as Website Y[2].

[2] The actual name of the live chatroom on Website Y is known to law enforcement. Website Y allows users to communicate anonymously and requires no registration. Website Y provides users

34. During relevant times described below, the UCA was located between Henderson County, within the Western District of North Carolina and Greenville, South Carolina, within the District of South Carolina.

**March 3, 2026**
**Website Y Communication between the UCA and "GentlePdForLgrl"**

35. The UCA assumed the online identity of an adult individual with access to a prepubescent female child located in or near Asheville, North Carolina. The UCA utilized an undercover screenname indicative of an adult female with access to a minor female child.

36. While in Website Y, the UCA received a private message from a user with the screenname "GentlePdForLgrl" that read, "heyy.",

37. The UCA replied to the user with a message that read, "hey there nice nickname (happy-face emoji)." The user "GentlePdForLgrl" replied, "thx its gets attention lol, not always good but ya know. So hows it going."

38. The UCA asked "GentlePdForLgrl" if he/she was located in "nc", indicating North Carolina. "GentlePdForLgrl" replied, "im not unf. I travel down that way quite a bit tho, a lot of friends in and around charlotte. What part u from?"

39. The UCA informed "GentlePdForLgrl" that he/she was located outside of Asheville and went on to ask the user what ages they were into.

---

the ability to send images and utilize the chat text instant messaging function to anonymously exchange communication. The live chat room located on Website Y remains active, and disclosure of the name of the live chat room name would potentially alert its users to the fact that law enforcement action is being taken against users on Website Y, thereby provoking users to notify other users of law enforcement action, flee, and/or destroy evidence. Accordingly, to protect the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the website will be identified herein as Website Y.

40. "GentlePdForLgrl" replied, "complicated question lol. Depends on if its just playing or are we talking about sex?"

41. The UCA replied, "anything sexual." "GentlePdForLgrl" replied, "fair, id say 7-16 but obvs ynger would just be oral and the basics. May I ask how old your daughter is?" The UCA replied, "shes 4yo going on 5." "GentlePdForLgrl" replied, "oh wow can I change my answer to 4-16 then haha. I don't really have a limit im just not really into force/pain etc."

42. The UCA and "GentlePdForLgrl" went on to exchange communication and get to know one another.

43. The UCA asked "GentlePdForLgrl" if he/she had "any experience with young?" "GentlePdForLgrl" replied, "a little bit yea. More exp with teenagers tbh. But a few from 5-8."

44. "GentlePdForLgrl" asked the UCA if he/she "would ever consider it," to which the UCA replied that he/she would.

45. "GentlePdForLgrl" replied, "well I would absolutely like to get to know you. Give me a really good reason to come to Asheville or even meet up sometime on a mommy daughter trip."

46. During the exchange in conversation, the UCA asked "GentlePdForLgrl" if he had access to an encrypted messaging application, herein referred to as Application A[3], as an alternate

[3] The actual name of the application and its functions on "Application A" are known to law enforcement. "Application A" is a secure, messenger app that prioritizes user privacy through high-level encryption, allowing anonymous communication without phone numbers. It enables encrypted voice/video calls, secure file sharing, and auto-deletes messages from servers, ensuring total privacy. "Application A" is available for mobile devices (iOS/Android) and desktop (Windows/macOS). Live chat rooms, known to law enforcement with associated on-going investigations are located on "Application A" remain active, and disclosure of the encrypted instant messaging application would potentially alert its users to the fact that law enforcement action is being taken against users on "Application A", thereby provoking users to notify other users of law enforcement action, flee, and/or destroy evidence. Accordingly, to protect the confidentiality and integrity of the ongoing investigation involved in this matter, specific names

form of communication. The UCA went on to send "GentlePdForLgrl" his/her undercover associated user identification number to be contacted via Application A.

47. The UCA received a reply from "GentlePdForLgrl" that read, "added."

48. During the course of the investigation, "GentlePdForLgrl" was identified as Roger Dale FERGUSON, Jr. (see paragraphs 104-108 below).

**March 3, 2026**
**Application A Communication between the UCA and "Mister"**

49. On March 3, 2026, the UCA received an invitation via Application A to communicate privately with a user with the username "Mister," believed to be FERGUSON.

50. The UCA accepted the invitation and sent a message to FERGUSON that read, "GentlePed?" FERGUSON replied, "that's me. hru momma."

51. The UCA and FERGUSON began to exchange messages and continued to get to know one another. FERGUSON provided personal information and stated he was in "WV so not terrible far" and that his name was "DJ" and that he was "49" years old.

52. The UCA informed FERGUSON that he/she and the child were located near Asheville and FERGUSON expressed interest in traveling to Western North Carolina to meet the UCA and the child.

53. The following exchange in messages occurred detailing FERGUSON's intent for traveling to Western North Carolina:

> FERGUSON: "I'm pretty curious what you'd be most interested to watch if I'd be lucky enough to come meet you and her sometime"

---

and other identifying factors have been replaced with generic terms and the encrypted instant messaging application will be identified herein as "Application A."

UCA: "I don't really have anything specific. Shes 4yo so I don't even know what can be done."

FERGUSON: "tbh, that depends, she can give and receive oral, kissing, touching rubbing etc. and even anal if done properly and gently. But also depends on how she responds and what you would be ok with. I would what to make sure we have rules/boundaries that I would happily respect."

54. The UCA asked FERGUSON about his employment to which FERGUSON replied, "work icu in a hospital" and later went on to state that he is currently married.

55. FERGUSON stated, "she does not know either and she cannot track anything. I would never bring drama into anything esp something like this. I will have a separate phone for you and I if this is something you decide you want to explore, and as far as [Application A] and chats I keep a computer at work that I use for this so nothing can be snooped through. It does not limit how much I can be online though."

56. FERGUSON went on to message, "I will have a separate phone like I said if this goes further so we can talk/text more and no just while working."

57. The UCA went on to ask FERGUSON, "are u into cp?"

58. FERGUSON replied, "yes, another reason I have to keep things private. Def don't want anyone to know that. What about you?"

59. The UCA replied, "yeah but I haven't seen any in a while." FERGUSON messaged, "would you like to see some?" and the UCA replied, "up to you :)"

60. FERGUSON replied, "do you prefer girl/guy or solo, woman/girl I have some of all as bad as I hate to admit lol."

61. FERGUSON went on to inform UCA that he has a brother who lives "close to chatlotte" and is "overdue" to visit.

**March 3, 2026**
**Distribution of CSAM to the Western District of North Carolina**

62. On March 3, 2026, while in communication with FERGUSON via Application A, the UCA stated he/she was located in Henderson County, North Carolina, which is located in the Western District of North Carolina.

63. On March 3, 2026, the UCA received 3 video files from user "Mister," believed to be owned and operated by FERGUSON. The video files were disseminated by FERGUSON and received by the UCA via Application A.

64. A review of the 3 video files revealed 3 unique child sexual abuse videos. The 3 unique video files were downloaded as evidence, reviewed, and described by the UCA as follows[4]:

**File #1:**

**File Name:** 99a80a90-172d-11f1-9758-4b551f304422.mp4

**File Length:** 00:00:18

**File Description:** The video file begins by depicting a close-up of a prepubescent female child, approximately 3-5 years of age, sitting on the lap of an adult male, while engaging in oral copulation of the adult males exposed penis. The child is depicted looking towards the camera and the adult male is seen pushing the child's

[4] The UCA noted that File #1 & File #2 were disseminated by FERGUSON at the same time and in the same chat message. The UCA downloaded both video files at the same time and upon review of the file names, it appears the video files were assigned the same file name. A review of each individual video file confirmed that both video files were unique and depicted unique child sexual abuse videos.

head down while she performs oral copulation on the adult male.

**File #2:**

**File Name:** 99a80a90-172d-11f1-9758-4b551f304422.mp4

**File Length:** 00:00:27

**File Description:** The video file begins by depicting a close-up of an adult male holding his exposed penis and rubbing it on a prepubescent female child, approximately 8-10 years of age, exposed vagina. The prepubescent female child is depicted nude from the waist down, while laying on a bed, and the adult male is depicted vaginally penetrating the child and is depicted rubbing his penis on the exterior of the child's vagina.

**File #3**

**File Name:** 11c602c0-172e-11f1-9758-4b551f304422

**File Length:** 00:01:13

**File Description:** The video file begins by depicting a close-up of a prepubescent female child, approximately 3-6 years of age, laying on her back with her legs spread open and exposing her vagina to the camera. An adult male's penis is depicted anally penetrating the prepubescent child through the entirety of the video.

65. FERGUSON followed the dissemination of the child sexual abuse material (CSAM) videos with a message that read, "I thinks it's the least I can do for someone willing to get to know me and possibly invite me down sometime."

66. The UCA informed FERGUSON to be careful if he was disseminating from his workplace to which FERGUSON replied, "vpn and private office."

67. FERGUSON went on to describe his physical features as, "im 5'8 maybe 190.muscular, blue eyes, trimmed beard and hopefully you don't mind that I shave my head."

68. FERGUSON and the UCA discussed tattoos and FERGUSON stated, "I have a band of thorns around my bicep thinking of covering it up with a sleeve just no clue what I want tbh."

69. The UCA provided FERGUSON with an undercover cell phone number as an alternate form of communication.

**March 3, 2026**
**URL Deployment to Application A user "Mister"**

70. On or about March 3, 2026, the UCA deployed a Uniform Resource Locator (URL) during an exchange with Application A user "Mister," believed to be FERGUSON.

71. The URL deployment was conducted pursuant to a pen register/trap and trace order obtained by Homeland Security Investigations (HSI) Cyber Crimes Center (C3) in the Eastern District of Virginia (EDVA).

72. On March 3, 2026, the UCA engaged in communication with FERGUSON via Application A. The UCA deployed the URL after FERGUSON distributed CSAM material and during a conversation about the UCA's purported 4-year-old child.

73. During the first deployment of the link, FERGUSON responded with a message that read, "it said expired token idk what that means lol."

74. A second deployment was attempted and FERGUSON replied with a screenshot of an error page.

75. The UCA attempted a third deployment and received a response message from FERGUSON that read, "yes it worked."

76. On or about March 3, 2026, at approximately 18:56:25 hours, FERGUSON accessed the URL, which recorded the User Internet Protocol (IP) address 184.19.238.4 and Client Port 16628[5].

77. On or about March 4, 2026, HSI C3 obtained and served a summons on Frontier Communications of America, Inc. for subscriber information associated with the IP address.

78. On or about March 16, 2026, Frontier Security Operations responded to the summons. The following are excerpts from the summons return; the complete return is retained in the investigative case file and is available for review:

**Customer Name:** St. Mary's Medical Center

**Account Address:** 2900 1st Ave., Huntington, WV

79. It is noteworthy that during the March 3, 2026, exchange, FERGUSON stated he was located in West Virginia and that he "work[s] icu in a hospital".

**March 5, 2026 - April 5, 2026**
**Telephonic Text Communication between the UCA and FERGUSON**

80. On March 5, 2026, the UCA and FERGUSON exchanged multiple messages via Application A. During the exchange in communication, FERGUSON expressed interest in traveling to Western North Carolina for the purposes of engaging in sexual acts with the UCA's purported four (4) year-old female child.

81. FERGUSON described his intended actions as, "her age, oral giving and receiving, rubbing my cock on pussy and ass. Fingering butt some. I think anal is possible all depends on how things go an better with time tbh."

---

[5] Additional IP addresses were recorded during the deployment of the URL. Due to technical issues encountered with the URL, HSI personnel were required to access the link. These IP addresses have been redacted; however, documentation of the redactions is available for review upon request.

82. The UCA went on to ask FERGUSON if he had any prior sexual experience with minors and if so, what was the youngest. FERGUSON replied, "5 and all the things I said above I did with her. Yes shy at first little shocked but did well after a bit and helps when mom is there and supportive."

83. FERGUSON went on to discuss his prior sexual experience with a 5-year-old female child and stated that, "it went on for a year" and that the mother took a job and that they moved away.

84. Between March 6, 2026, through March 23, 2026, the UCA and FERGUSON continued their communication sporadically via Application A.

85. On March 23, 2026, the UCA received a message from FERGUSON via Application A that read, "Hey sent you a text."

86. On March 23, 2026, the UCA received an incoming text message to his/her undercover cell phone from telephone number (304) 544-1071. The message read, "Hey [UCA first name] its DJ."

87. On March 26, 2026, the UCA responded to FERGUSON via text with a message that read, "Hey DJ how are you?" The two engaged in casual conversation about their activities for the last few days.

88. The UCA sent a text message that read, "Did you end up just getting a prepaid?"

89. FERGUSON replied, "I did. Decided it would be simpler."

90. The UCA and FERGUSON discussed FERGUSON potentially traveling to Western North Carolina in May of 2026. The two discussed the possibility of the UCA and the purported child traveling to visit FERGUSON sometime.

91. The UCA messaged, "Where would we be going if we decided to make a girls trip? Like just curious what hotels are like in the area." FERGUSON replied, "Huntington is the area closest to me. It's like 30 min from Charleston. Neither place is very big like 40-50000 people and are the two biggest cities lol. Most ppl come to WV for the mountain's trails etc. and most of those are a couple hours from me."

92. On April 5, 2026, FERGUSON requested to speak with the UCA via voice communication and requested to "swap" photographs of one another.

**April 6, 2026**
**Telephonic Voice Communication between the UCA and FERGUSON**

93. On April 6, 2026, at or about 3:06PM (EST) the UCA called (304) 544-1071 and spoke with an adult male, believed to be FERGUSON (confirmed as "Dale Junior"). FERGUSON stated he was leaving work, typically arrives at 5:45am, and wakes up at 4:30am. FERGUSON and the UCA discussed Memorial Day weekend travel plans and concerns about FERGUSON being married and able to get away.

94. The UCA informed FERGUSON that after thinking about the travels that it would probably make the UCA's purported 4-year-old daughter more comfortable if she were in her own space. The UCA stated, "Cuz like at 4, new places take her a minute to get accustomed to." FERGUSON replied, "Yeah, new places and obviously, new experiences." When asked about prior experiences, FERGUSON said he had a handful, involving one person, aged five. The UCA asked about showing the UCA's purported child any of the videos FERGUSON had previously sent; FERGUSON replied, "I don't know that that would be bad thing, kind of like ease into things." FERGUSON went on to say, "I think any type of, you know, slow introduction is never

a terrible thing. Anything to keep from kind of overwhelming her, you know, all at once. I think it's the best." FERGUSON went on to say that even if it ended up being a "one time thing" he did not want it to be a "traumatizing one-time thing."

95. The UCA and FERGUSON discussed possibly meeting the week of May 4, 2026. The UCA suggested meeting in person and eating in Western North Carolina prior to FERGUSON meeting the purported female child.

96. The UCA informed FERGUSON that he/she had trouble opening Application A; FERGUSON recommended the UCA look into utilizing a secondary encrypted application and provided the name to the UCA[6].

97. The UCA asked FERGUSON if he was part of an on-going chatroom. FERGUSON stated he had been in chatrooms in the past but that the rooms died out quickly. FERGUSON stated he utilizes Application A on the current phone that he is communicating on and stated, "I put my Application A on this phone. I kind of routed all that stuff on this phone."

98. The UCA asked FERGUSON if his name was "DJ." FERGUSON replied, "This is one of those that it is and it isn't. My name is "Dale" but I'm a junior.

99. FERGUSON went on to say, "If I sense or you sense that she needs to take a little break to just go eat a cookie then that's fine."

100. The UCA asked FERGUSON if he still keeps in contact with the other mom. FERGUSON replied, "Occasionally, just more of a courtesy I guess to just check in and make sure everybody is doing well."

101. FERGUSON stated he has 2 older children and stated they are "grown."

---

[6] The UCA is familiar with the encrypted messaging application and is known to law enforcement to be utilized frequently for the discussion and dissemination of child sexual abuse material.

102. FERGUSON and the UCA agreed to contact one another once a firm date was going to be scheduled for FERGUSON travel to Western North Carolina.

103. On or about April 7, 2026, HSI Greenville submitted a summons to Verizon Wireless requesting subscriber and call information for telephone number 304-544-1071. Verizon Wireless responded on or about April 22, 2026. While the response contained additional information, the results indicate that the account was activated on March 23, 2026, and the device on the account is a Motorola XT2417D. Additionally, Verizon Wireless advised that legal service should be directed to TracFone[7], a prepaid wireless provider in the United States.

**April 9, 2026**
**Image sent to the UCA by FERGUSON**

104. On April 9, 2026, at approximately 12:28 PM (EST), the UCA received an incoming text message from telephone number (304) 544-1071 with the following digital image file attached:



105. To help identify the person in the image, facial recognition technology (FRT) was used to compare the image with a collection of publicly available and open-source images. The

[7] On or about April 26, 2026, HSI Greenville submitted a summons to TracFone Phone Wireless Inc. d/b/a/ Simple Mobile for subscriber and call information associated with telephone number 304-544-1071. As of the date of this affidavit, the results have not yet been received.

FRT found a likely match with a publicly available image linked to a Facebook profile named "DaleandNicole Ferguson[8]."

106. A query of law enforcement databases revealed the following individual who appears to be the same individual in the image shown above:



**Name:** Roger Dale Ferguson, Jr.

107. The information from the law enforcement database with the name and image also supplied a date of birth that would make him 51 years of age.

108. Additionally, a query of West Virginia employment information revealed FERGUSON is currently employed at St. Mary's Medical Center.

**April 9, 2026**

**Distribution of Child Sexual Abuse Material to the District of South Carolina**

109. On April 9, 2026, while in communication with FERGUSON via Application A, the UCA was located in Greenville South Carolina, which is located within the District of South Carolina.

[8] The Facial Recognition Technology (FRT) also returned additional images. Upon review, these images were confirmed to be less likely results and do not appear to depict the same individual as the one shown in the image provided to the UCA.

110. On April 9, 2026, the UCA received 5 video files from user "Mister," believed to be owned and operated by FERGUSON. The video files were disseminated by FERGUSON and received by the UCA via Application A. A review of the 5 video files revealed 5 unique child sexual abuse videos.

111. The following will describe 2 of the 5 unique video files disseminated by FERGUSON. All 5 video files were downloaded as evidence, reviewed, and 2 are described by the UCA as follows[9]:

**File #1:**

**File Name:** d5a3a4c0-3422-11f1-9ae2-ad4ac9acaff2.mp4

**File Length:** 00:00:09

**File Description:** The video file begins by depicting a close-up of a prepubescent female child, approximately 3-5 years of age, wearing a red, white and blue striped shirt, engaging in oral copulation on an adult male's exposed penis. The child is depicted utilizing her hand to hold the adult male's exposed penis while simultaneously orally copulating the adult male throughout the entirety of the video.

**File #2:**

**File Name:** d5a3a4c0-3422-11f1-9ae2-ad4ac9acaff2.mp4

**File Length:** 00:01:17

[9] The UCA noted that all 5 video files were disseminated by FERGUSON at the same time and in the same chat message. The UCA downloaded all 5 video files at the same time and upon review of the file names, it appears the video files were assigned the same file name. A review of each individual video file confirmed that all 5 video files were unique and depicted unique child sexual abuse videos.

**File Description:** The video file begins by depicting a close-up of a prepubescent female child, approximately 2-4 years of age, wearing a light blue and navy-blue striped shirt and a diaper, while holding a toy in her right hand. The video depicts the child engaging in oral copulation on an adult males exposed penis. The child is depicted utilizing her hand to hold the adult male's exposed penis while simultaneously orally copulating the adult male throughout the entirety of the video.

112. FERGUSON followed the disseminated CSAM videos with a message that read, "Here is some videos for you to share with [your daughter]."

**April 10, 2026**
**Distribution of Child Sexual Abuse Material to the District of South Carolina**

113. On April 10, 2026, while in communication with FERGUSON via Application A, the UCA was located in Greenville South Carolina, which is located within the District of South Carolina.

114. On April 10, 2026, the UCA received 4 video files from user "Mister," believed to be owned and operated by FERGUSON. The video files were disseminated by FERGUSON and received by the UCA via Application A.

115. A review of the 4 video files revealed 4 unique child sexual abuse videos. The following will describe 2 of the 4 unique video files disseminated by FERGUSON. All 4 video files were downloaded as evidence, reviewed, and 2 are described by the UCA as follows[10]:

[10] The UCA noted that all 4 video files were disseminated by FERGUSON at the same time and in the same chat message. The UCA downloaded all 4 video files at the same time and upon review of the file names, it appears the video files were assigned the same file name. A review of each individual video file confirmed that all 4 video files were unique and depicted unique child sexual abuse videos.

**File #1:**

**File Name:** cdb8fdf0-34f9-11f1-be74-e5f0c74cc5f6.mp4

**File Length:** 00:003:29

**File Description:** The video file begins by depicting a close-up of a prepubescent female child, approximately 3-5 years of age, fully nude and sitting up right on top of an adult nude male. The adult male is depicted laying on his back while nude and exposing his penis. The prepubescent female child is seen sitting on top of the adult male and is depicted rubbing her vagina on the adult's male's penis throughout the entirety of the video.

**File #2:**

**File Name:** cdb8fdf0-34f9-11f1-be74-e5f0c74cc5f6.mp4

**File Length:** 00:00:30

**File Description:** The video file begins by depicting a close-up of a prepubescent female child, approximately 2-4 years of age, fully nude, while laying on her back and exposing her genitals to the camera. An adult male is depicted nude and anally penetrating the prepubescent minor female with his exposed penis throughout the entirety of the videos.

116. FERGUSON followed the disseminated CSAM videos with a message that read, "Found a few more things you might enjoy."

**April 12, 2026**
**Distribution of Child Sexual Abuse Material to District of South Carolina**

117. On April 12, 2026, while in communication with FERGUSON via Application A, the UCA was located in Greenville South Carolina, which is located within the District of South Carolina.

118. On April 12, 2026, the UCA received 18 digital image files from user "Mister," believed to be owned and operated by FERGUSON. The image files were disseminated by FERGUSON and received by the UCA via Application A.

119. A review of the 18 image files revealed 18 unique child sexual abuse images. The following will describe 2 of the 18 unique image files disseminated by FERGUSON. All 18 image files were downloaded as evidence, reviewed, and 2 are described by the UCA as follows[11]:

**File #1:**

**File Name:** 5341b810-369c-11f1-bd81-914b7342756b.jpg

**File Description:** The image file depicts a close-up of a prepubescent female child, approximately 3-5 years of age, wearing a yellow t-shirt with cartoon animations and is depicted nude from the waist down. The child is depicted exposing her vagina and anus and an adult male's face is partially seen in the image. The adult male is depicted with his tongue on the child's exposed vagina.

[11] The UCA noted that all 18 image files were disseminated by FERGUSON at the same time and in the same chat message. The UCA downloaded all 18 image files at the same time and upon review of the file names, it appears the image files were assigned the same file name. A review of each individual image file confirmed that all 18 image files were unique and depicted unique child sexual abuse videos.

**File #2:**

**File Name:** 5341b810-369c-11f1-bd81-914b7342756b.jpg

**File Description:** The image file depicts a close-up of a prepubescent female child, approximately 6-10 years of age, wearing a pink skirt and exposed upper chest. The child is depicted leaning over an adult nude male engaging in oral copulation on the adult male's exposed penis.

120. FERGUSON followed the disseminated CSAM videos with a message that read, "Found some pics in case you wanted to show [your daughter] some of them."

**April 14, 2026**
**Distribution of Child Sexual Abuse Material to the District of South Carolina**

121. On April 14, 2026, while in communication with FERGUSON via Application A, the UCA was located in Greenville South Carolina, which is located within the District of South Carolina.

122. On April 14, 2026, the UCA received 2 digital image files from user "Mister," believed to be owned and operated by FERGUSON. The image files were disseminated by FERGUSON and received by the UCA via Application A.

123. A review of the 2 image files revealed 2 unique child sexual abuse images. The following will describe 2 of the 2 unique image files disseminated by FERGUSON. All 2 image files were downloaded as evidence, reviewed, and 2 are described by the UCA as follows[12]:

---

[12] The UCA noted all 2 image files were disseminated by FERGUSON at the same time and in the same chat message. The UCA downloaded all 2 image files at the same time and upon review of the file names, it appears the image files were assigned the same file name. A review of each individual image file confirmed that all 2 image files were unique and depicted unique child sexual abuse videos.

**File #1:**

**File Name:** 8c776ad0-380e-11f1-aa41-f11b7a417f78.jpg

**File Description:** The image file depicts a close-up of a prepubescent female child, approximately 3-5 years of age, wearing a white t-shirt and is seen nude from the waist down. The child is depicted with her legs spread open and is seen utilizing her hands to expose her vagina and anus to the camera. A lime green and white striped towel is depicted in the background of the image.

**File #2:**

**File Name:** 8c776ad0-380e-11f1-aa41-f11b7a417f78.jpg

**File Description:** The image file depicts a close-up of a prepubescent female child, approximately 3-5 years of age, wearing a white t-shirt and is seen nude from the waist down. The child is depicted with her legs spread open while exposing her vagina and anus to the camera. A white liquid substance is depicted on the outside of the prepubescent female child's vagina. A lime green and white striped towel is depicted in the background of the image.

124. No message was included following the dissemination of the image files by FERGUSON.

**April 17, 2026**
**Distribution of CSAM to the Western District of North Carolina**

125. On April 17, 2026, while in communication with FERGUSON via Application A, the UCA stated he/she was located in Hendersonville, North Carolina, which is located within the Western District of North Carolina.

126. On April 17, 2026, the UCA received 1 video file and 1 digital image from user "Mister," believed to be owned and operated by FERGUSON. The video file and image file were disseminated by FERGUSON and received by the UCA via Application A.

127. A review of the video file and image file revealed the video file depicted a unique child sexual abuse video. The image file did not depict child sexual abuse material.

128. The video file was downloaded as evidence, reviewed, and described by the UCA as follows:

> **File #1:**
>
> **File Name:** c9b50a00-3a6c-11f1-881b-0b41ca500acb.mp4
>
> **File Length:** 00:00:23
>
> **File Description:** The video file begins by depicting a close-up of a prepubescent female child, approximately 2-4 years of age, fully nude and seen with a pink pacifier in her mouth while holding what appears to be a cell phone in her hand. The child is depicted staring into the phone while simultaneously bouncing up and down on top of a peach-colored sex toy. The sex toy is depicted vaginally penetrating the child as the child moves her body throughout the entirety of the video.

129. No message was included following the dissemination of the image files by FERGUSON.

**April 22, 2026**
**Distribution of Child Sexual Abuse Material to the District of South Carolina**

130. On April 22, 2026, while in communication with FERGUSON via Application A, the UCA was located in Greenville South Carolina, which is located within the District of South Carolina.

131. On April 22, 2026, the UCA received 3 video files from user "Mister," believed to be owned and operated by FERGUSON. The video files were disseminated by FERGUSON and received by the UCA via Application A.

132. A review of the 3 video files revealed 3 unique child sexual abuse videos. The following will describe 2 of the 3 unique video files disseminated by FERGUSON. All 3 video files were downloaded as evidence, reviewed, and 2 are described by the UCA as follows[13]:

**File #1:**

**File Name:** b40d32f0-3e6c-11f1855f-7b648dd17e25.mp4

**File Length:** 00:001:00

**File Description:** The video file begins by depicting a close-up of a prepubescent female child, approximately 4-6 years of age, wearing a white t-shirt and what appears to be a white hospital mask over her eyes. The child is depicted engaging in oral copulation of an adult male who is partially depicted with an exposed penis. As the video concludes, the adult male is depicted ejaculating during the oral copulation by the child.

[13] The UCA noted that all 3 video files were disseminated by FERGUSON at the same time and in the same chat message. The UCA downloaded all 3 video files at the same time and upon review of the file names, it appears the video files were assigned the same file name. A review of each individual video file confirmed that all 3 video files were unique and depicted unique child sexual abuse videos.

**File #2:**

**File Name:** b40d32f0-3e6c-11f1855f-7b648dd17e25.mp4

**File Length:** 00:00:57

**File Description:** The video file begins by depicting a close-up of an adult male, standing and exposing his penis white wearing dark navy-blue shorts. A prepubescent female child, approximately 6-8 years of age, is depicted wearing a white and green tank top shirt standing next to what appears to be a mattress with plaid beige and brown sheets. The child is depicted turning towards the adult male and is seen engaging in oral copulation of the adult male throughout the entirety of the video.

133. FERGUSON followed the disseminated CSAM videos with a message that read, "What do you think about the videos."

**April 28, 2026**
**Distribution of Child Sexual Abuse Material to the District of South Carolina**

134. On April 28, 2026, the UCA received an incoming text message to his/her UC telephone from telephone number (304) 544-1071 believed to be owned and operated by FERGUSON.

135. The text message read, "I sent you a few more pictures and a couple new videos (heart emoji)."

136. The UCA went on to respond to FERGUSON asking if he was at work and how he found the videos.

137. FERGUSON responded via text message with a message that read, “People I’ve met in chats send them to me on [Application A]. Yes I’m at work lol. Secret phone and a VPN to hide locations helps.”

138. On April 28, 2026, while in communication with FERGUSON via exchange and text message and Application A, the UCA was located in Greenville South Carolina, which is located within the District of South Carolina.

139. On April 28, 2026, the UCA reviewed the Application A undercover account and received 4 digital image files and 6 video files from user “Mister,” believed to be owned and operated by FERGUSON. The video files were disseminated by FERGUSON and received by the UCA via Application A.

140. A review of the 4 digital image files and 6 video files depicted unique child sexual abuse videos. The following will describe 2 of the 6 unique video files disseminated by FERGUSON. All 4 digital image files and 6 video files downloaded as evidence, reviewed, and 2 are described by the UCA as follows:

**File #1:**

**File Name:** 79b25c70-4321-11f1-bbfe-833ba9a74dc7.mp4.mp4

**File Length:** 00:00:50

**File Description:** The video file begins by depicting a close-up of a prepubescent female child, approximately 3-5 years of age, laying on a bed with her back to the camera. The child is depicted nude from the waist down and wearing only a teal t-shirt with yellow underwear pulled to her ankles. The child is depicted laying on her stomach with her legs open and her buttocks visible to the camera. The child appears to be staring into a laptop. At approximately 00:26, an adult nude male is

depicted walking behind the child and is seen placing his penis over the child's buttocks. The adult male is depicted masturbating and ejaculating while rubbing his penis on the child's anus.

**File #2:**

**File Name:** 66622ac0-4320-11f1-8c0d-89d30-8ea2196.mp4

**File Length:** 00:00:14

**File Description:** The video file begins by depicting a close-up of a prepubescent female child, approximately 2-4 years of age, wearing a pink top and holding a flashlight in her right hand. An adult male is depicted exposing his penis in front of the child. The video depicts the child engaging in oral copulation on an adult males exposed penis. The child is depicted utilizing her hand to hold the adult male's exposed penis while simultaneously orally copulating the adult male throughout the entirety of the video.

**May 1, 2026**
**Telephonic Text Communication between the UCA and FERGUSON**

141. On May 1, 2026, the UCA received an incoming text message to his/her undercover cell phone from telephone number (304) 544-1071. The message read, "Morning [UCA first name]. I was up off and on last night. My son had an appointment with the urologist yesterday afternoon and he had to have surgery Monday. Don't know the time yet. I am so so sorry that I cannot come down. Even though it should be an outpatient procedure by the time I would get on the road it would be really late when I got there and I'm not sure my wife and son would be happy if I still planned a trip. I would have texted you as soon as he told me but I couldn't get away to do

it. Please do not even think that I am backing out or not wanting to see you and [your daughter], I do so very much. I just need to be there for him too. I am sorry if you spent money preparing for me and I will take care of it when I do come down. If you can forgive me and look at your schedule for June/July or whenever is best for you let me know and I will request time off. If I have 5-6 weeks of notice I can get time off easier bc they make my schedule a month at a time and we have 65 people in the department. I know my words cannot make up for cancelling but I am truly disappointed and sorry. I honestly only slept maybe an hour last night not just worrying about my son but worrying that you would be upset with me and I do not want to ever hurt you in any way."

142. Throughout May 1, 2026, the UCA and FERGUSON engaged in text message correspondence, which ultimately resulted in the termination of their communication via text message.

**<u>June 5, 2026, through June 15, 2026</u>**
**<u>Application A Communication between the UCA and "Mister"</u>**

143. On June 5, 2026, the UCA sent an outgoing message to FERGUSON via Application A, the message read, "hey there how are you?" During the exchange of communication FERGUSON sent the UCA a message that read, "I still have your number saved but I ditched the phone I had. I only bought it for you. You seemed so upset and disappointed with me and pretty much said you were done and move on I didn't see the point in keeping it and risking it being found."

144. On June 8, 2026, the UCA messaged FERGUSON and informed him that that made sense since the UCA attempted to text him and did not receive a reply. The UCA went on to ask FERGUSON how he managed to continue to utilize Application A.

145. On June 9, 2026, the UCA received an incoming message that read, "its kind of a pain but I have to remember my ID and log back in each time, so she cant see my messages."

146. Throughout the following days, the UCA and FERGUSON exchanged sporadic messages regarding the UCA's potential travel to FERGUSON's location in the company of the purported four-year-old child.

147. On June 12, 2026, the UCA received an incoming message that read, "theres a hampton inn barboursville, wv. its right by a mall. has an indoor pool and is close to the interstate. theres couple more near by but it's the only one with a pool."

**June 23, 2026**
**Distribution of Child Sexual Abuse Material to the District of South Carolina**

148. On June 23, 2026, the UCA while in communication with FERGUSON via Application A, the UCA was located in Greenville South Carolina, which is located within the District of South Carolina.

149. On June 23, 2026, the UCA received 2 video files from user "Mister," believed to be owned and operated by FERGUSON. The video files were disseminated by FERGUSON and received by the UCA via Application A.

150. A review of the 2 video files revealed 2 unique child sexual abuse videos. The following will describe the 2 unique video files disseminated by FERGUSON. Both video files were downloaded as evidence, reviewed, and are described by the UCA as follows:

**File #1:**

**File Name:** 35fdc660-6f1b-11f1-a244-9925d19ee81f.mp4

**File Length:** 00:01:46

**File Description:** The video file begins by depicting a close-up of a prepubescent female child, approximately 7-10 years of age, laying on a bed with her back to the camera. The child is depicted nude from the waist down and is exposing her anus to the camera. An adult male is depicted anally penetrating the child throughout the entirety of the video. The adult male is later depicted ejaculating inside the child's anus and is seen utilizing his right hand to further expose the child's anus.

**File #2:**

**File Name:** 73a51eb0-6f1a-11f1-a244-9925d19ee81f.mov

**File Length:** 00:00:11

**File Description:** The video file begins by depicting a close-up of a prepubescent female child, approximately 3-6 years of age, laying on her back and exposing her vagina and anus to the camera. An adult male's exposed penis is depicted anally penetrating the child throughout the entirety of the video. A rust-colored bedding sheet is depicted in the background of the video.

**June 24, 2026**
**Telephonic Text Communication between the UCA and FERGUSON**

151. On June 24, 2026, the UCA and FERGUSON continued to exchange communication via Application A with discussions of the UCA's plans to travel to FERGUSON's location

152. During the exchange, FERGUSON informed the UCA that he was currently at work and messaged, "yea work. And I'd like to come there but cant until late aug/sept. hospitals summer vac rules are strict on time off. We will get something figured out though.

153. The UCA went on to ask FERGUSON if he utilizes Application A on his computer. FERGUSON replied with a message that read, "yes now I use on the computer. I had it on the phone as well and didn't seem to have any trouble with it there either."

154. The UCA replied with a message that read, "lol be careful at work that no one walking in on you looking at videos."

155. FERGUSON replied with a message that read, "oh I know. be pretty bad. be bad also if they saw im hoping to be naked with someones lil girl too."

## X. CONCLUSION

156. Based on the foregoing, I respectfully submit that there is probable cause to believe that FERGUSON, residing at the SUBJECT PREMISES, has violated the federal criminal statutes identified herein as the Subject Offenses, and that contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B of this affidavit, are located at the SUBJECT PREMISES, as further described in Attachment A.

157. Your affiant, therefore, respectfully requests that the Court issue a search warrant for the SUBJECT PREMISES; the content of computers and electronic storage devices located and seized therein; content of any locked cabinets, containers, drawers, boxes or other receptacles large enough for paper record retention or electronic storage devices located therein; the person of FERGUSON, if he is located at the SUBJECT PREMISES, and any vehicles located at the SUBJECT PREMISES, authorizing the seizure and search of the items described in Attachment B.

Further your affiant sayeth not.

TERRANCE TAYLOR
Digitally signed by TERRANCE L TAYLOR
Date: 2026.09.10 16:59:3
-04'00'

SPECIAL AGENT TERRANCE L. TAYLOR
DEPARTMENT OF HOMELAND SECURITY
HOMELAND SECURITY INVESTIGATIONS

Signed and sworn to by telephonic means
on this 10th day of September, 2026:

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF WEST VIRGINIA

Omar J. Aboulhosn
United States Magistrate Judge